UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| LARRY ALDRIDGE, | CIV 19-4114 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER DENYING SUMMARY JUDGMENT |
| -vs- | |
| RAPID CITY PIERRE & EASTERN RAILROAD, INC., | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff, Larry Aldridge ("Aldridge"), has filed a Complaint alleging that Defendant, Rapid City Pierre & Eastern Railroad, Inc. ("RCP&E" or "the Railroad"), discriminated against him based on his race in violation of Title VII of the Civil Rights Act of 1964. He claims that he was subjected to a hostile work environment, received unequal treatment compared to his non-minority counterparts, and was wrongfully terminated from employment on account of his race and color. He asks for compensatory and punitive damages. Aldridge has abandoned his claim that his termination was a result of unlawful retaliation. RCP&E has moved for summary judgment on all of Plaintiff's claims. (Doc. 18.) For the reasons stated in this memorandum opinion, the motion for summary judgment is denied.

## FACTUAL BACKGROUND

The facts are taken primarily from Aldridge's deposition and Plaintiff's Response to Defendant's Statement of Undisputed Material Facts and Plaintiff's Statement of Material Facts In Opposition to Defendant's Motion for Summary Judgment, Doc. 23, because, on summary judgment, this Court views the facts in the light most favorable to the non-movant.

RCP&E is a Class II railroad that has been owned and operated by Genesee & Wyoming, an American short line railroad holding company, since 2014. Aldridge is an African-American man. He was hired by Dakota, Minnesota & Eastern Railroad ("DM&E") in 2008. When DM&E became a subsidiary of Canadian Pacific Railroad ("CP"), his hire date was noted as December 19,

2011. After Genesee & Wyoming purchased DM&E and formed RCP&E in 2014, the Railroad used that date as Aldridge's hire date. But his seniority with RCP&E was based on his DM&E hire date.

Aldridge was hired as part of the Railroad's "extra board." The Railroad's "extra board" is an on-call system to take overflow trains. From 2014 to November 2017, Aldridge was a conductor based in Huron, South Dakota. In 2017, Aldridge received his engineer certification by going through a training program put on by RCP&E at their offices in Jacksonville, Florida. The entire time he was with the Railroad, Aldridge was required to be available to be called into work by the Railroad, 24 hours a day, 7 days a week, unless he was taken off the board when using a sick day, vacation, or approved time off. His direct supervisors were John McDonald and Lyn Fliehs, trainmasters based in Huron. At some point Fliehs received a demotion and Greg Millen became supervisor. Two additional supervisors were based in Brookings - - Gina Zink and Terri Jaacks. Zink and Jaacks were the full-time managers on duty for the extra board. When they were on vacation or it was a weekend, trainmasters such as Fliehs or McDonald filled in.

The RCP&E does not have a formal written disciplinary process. The only way upper management knew if an employee missed a call or called in sick and was not sick was if the trainmaster or manager on duty reported the violation. The supervisors decided whether to call or email the general manager if somebody missed a call. Aldridge asserts that he was disciplined for things that other employees were able to do without being disciplined, and he attributes it to being black.

The Railroad maintains an employee handbook that is made available to all employees. The employee handbook includes policies prohibiting discrimination and/or harassment and sets forth directions for employees to follow in the event they believe they are being discriminated against. The policy states:

> If you believe you have been unlawfully discriminated against, immediately inform your supervisor. If you believe your supervisor is the source of the unlawful discrimination, or if the activity continues, contact your Human Resource Representative, so that your concerns can be appropriately addressed.

Aldridge testified that he followed these procedures and reported to six different managers or human resource representatives that he was being treated differently because of his race. He said he made reports of his experiences to: 1) Cory Thompson, the head of Human Resources ("HR"); 2) John

McDonald; 3) Greg Millen; 4) Shawn Engel, the assistant general manager; 5) Blake Jones, the general manager; and 6) Tanya Shafer, a HR representative. Aldridge says his concerns were never investigated or addressed.

Blake Jones ("Jones") was the general manager of RCP&E from 2016 to 2018. Jones testified that he received some training on racial discrimination by watching a half-hour video regarding the Railroad's "code of ethics." The video contained multiple sections regarding different parts of the Railroad's code of ethics, and the part regarding discrimination was just one section of the video. Jones testified that Aldridge was a good employee who had trouble showing up for work. (Doc. 24-3, Jones depo, pp. 43-44.)

The Railroad presented evidence of ten disciplinary actions against Aldridge from 2015 through his termination on August 15, 2018. Aldridge contends that white employees were permitted to do these same things without consequence.

On or about December 27, 2014, Aldridge submitted a layoff request to his trainmaster asking to be excused from work on January 1, 2015. His request to be excused was denied. Aldridge chose to lay off without authorization on January 1, 2015, and he was issued a written warning letter which set forth the basis for his discipline. Aldridge presented evidence that his white co-workers, David Hine and Tysen Parker, were allowed to layoff without being sick in advance of the date.

On March 12, 2015, Aldridge was working with a white engineer named Terry Larson. Because Larson was the engineer on the train, he was driving when he went through a switch. Aldridge was going to get a marker to put on the rear end of the train. Instead of punishing Larson for his mistake, the Railroad originally was only going to punish Aldridge by suspending him. Another white employee stepped in to say that Aldridge should not be suspended. Both Larson and Aldridge ended up being disciplined. Aldridge received a three-day suspension where one day was served and two days were deferred. The disciplinary charge advised that future incidents would "result in further disciplinary action to include possible suspension." Aldridge asserts that other employees have gone through switches and did not receive suspensions.

On August 12 or 13, 2015, Aldridge laid off from work without any compensated time available. The Railroad issued him a warning letter "for excessive absenteeism" which informed

Aldridge that further failures to protect the Railroad's full time employment "will result in further disciplinary action including possible suspension or termination."

On February 12, 2016, Aldridge had taken a train to Tracy, Minnesota and he needed to move out of his home because the landlord needed the space for his mother-in-law. Aldridge asked to use a sick day to move but he was not allowed to. He failed to accept a call to come in to work. Aldridge asserts that white engineers were permitted to use sick days to move, or to do other things, but Aldridge was not.

As a result of the passage of a collective bargaining agreement between the Railroad and the Union, Aldridge had the option of (1) challenging discipline for the February 12, 2016 infraction through an investigation and hearing, or (2) waiving his right to a hearing and accepting responsibility. Aldridge followed his union representative's recommendation that he waive his right to an investigation and hearing in order to avoid harsher discipline by the Railroad. He was given a seven day suspension, with three actual days and four days deferred.

On February 15, 2016, and on April 20, 2016, Aldridge failed a sidewinder test and was given a nine-day suspension. He contends that other engineers who failed sidewinder tests did not receive any discipline. He waived his right to a hearing after his union representative told him he would get a longer suspension if he did not waive.

Aldridge was going on vacation on July 11, 2016. Usually employees were taken off the board the day before their vacation to ensure they were not at work when their vacation began. He expected to be taken off the board the day before just like everyone else before going on vacation. When he learned he would not be taken off the board on July 10, Aldridge called in and requested to use a day off, and was denied. In response to the Railroad's allegation that he marked off for vacation on July 10, 2016 without proper permission, Aldridge requested a formal investigation and hearing, which took place on July 14, 2016. He admitted that he marked off without permission on July 10. On July 25, 2016, Aldridge received a written warning for the July 10 layoff. According to Aldridge, other employees were not disciplined for this same conduct.

Aldridge received a call the morning of October 9, 2016 to report for duty. He told the manager on duty that he was sick and not able to report to work. He had used all of his available sick days. It was a weekend so he could not get a doctor's note that day, but he did get a note later. He was charged with missing a call on October 9, 2016. After an investigation and hearing on

November 10, 2016, the Railroad issued a 14-day suspension on November 17, 2016. Aldridge was informed in writing that "any future substantiated rules violations, including unexcused absenteeism will result in additional disciplinary action up to and including dismissal."[1]

Aldridge appealed this suspension to the National Railroad Adjustment Board ("NRAB"). Over two years later, on January 17, 2019, the Railroad's decision was upheld by the NRAB. Aldridge contends that the NRAB relied on previous discipline that had been given to Aldridge for discriminatory reasons.

Aldridge alleges that, after the November 2016 suspension, he called Tanya Shafer ("Shafer") in the HR department, reported his belief that he was being treated unfairly, and asked Shafer for the phone number of the company's headquarters in Jacksonville. (When he went to engineer training in Jacksonville, they told Aldridge to call if he had any problems.) According to Aldridge's deposition testimony, Shafer advised Aldridge to call the company's lawyer. But Aldridge wanted to talk to the people in Jacksonville. Shafer contacted the head of HR, Cory Thompson. Thompson called Aldridge to ask what was going on. Thompson advised Aldridge to call Shafer back and tell her that he wants to talk to people about how he was being treated. Aldridge called Shafer back and told her he was being treated unfairly. Shafer said she would look into it, but Aldridge did not hear back from her.

On June 5, 2017, Aldridge asked to use a sick day because he needed to move. His request was denied but he did not report to work. The Railroad contends that, by that time, it had changed its policy and no longer permitted employees to use sick days if they were not actually ill. Aldridge contends that during this same time frame at least three white employees used sick days when they were not sick and did not received discipline. After being advised by his union representative that he would get double the punishment if he challenged the decision, Aldridge waived his right to a hearing. On July 16, 2017, he was issued a suspension and informed in writing that "further disciplinary actions within the next 18 months can result in suspension and/or termination of employment with the RCPE railroad."

---

[1] Aldridge testified that his supervisor later told him they had "messed up" and should have allowed him that time off because he had a doctor's note, and that the Railroad would reimburse him for the days he was off work for the suspension. Aldridge was never reimbursed and the infraction remained on his record.

On August 20, 2017, Aldridge missed a call for work. Following this incident, Alrdidge requested an investigation and had a meeting with the general manger, Blake Jones, and the assistant general manager, Shawn Engel, on September 18, 2017. His co-worker, Tysen Parker, attended the meeting as Aldridge's union representative. During this meeting, Aldridge was informed that his disciplinary history was to a point where it would ordinarily result in an employee's termination. Aldridge alleges that during the September 2017 meeting, he told Jones that he believed he was being treated unfairly because of his race. Jones asked Aldridge to provide a list of names of white employees who were not disciplined for the same conduct. Aldridge says he complied with that request but never heard back from Jones on the issue.

Aldridge was offered a final chance to correct his conduct. On September 18, 2017, he signed a letter which stated, in part:

> I agree that given my attendance history this would normally result in dismissal from my employment with the RCPE, and that if I have another violation related to the GWRR Attendance Policy or Rules 1.15 and 1.16 in calendar year 2107 [sic] I will resign my position without a hearing. Further disciplinary actions in 2018 can result in suspension and/or termination of employment with the RCPE railroad.

(Doc. 21-1, Aldridge depo, Ex. 11.)

On June 25, 2018, Aldridge missed a call from work, but he did get there to drive a later train that same day. A hearing was held on July 18, 2018, and Aldridge was terminated on August 15, 2018. Aldridge says his white counterparts were not terminated after a second missed call. He appealed the termination decision to the NRAB. On April 8, 2020, the Railroad's decision was upheld.

One of his co-workers, David Hine, submitted a letter on behalf of Aldridge, writing that he himself had missed a call and had not been disciplined. In his deposition, Aldridge testified about a number of instances he is aware of where white employees missed calls and did not receive any discipline.

During his employment with the Railroad, Aldridge worked with a manager named Terri Jaacks ("Jaacks"). While Aldridge was getting in a cab to go get a train, Jaacks asked him what he was doing and told him that "blacks are not supposed to be - blacks are supposed to be in the back." Aldridge doesn't recall when the comment by Jaacks was made. Aldridge did not submit a written

6

documentation about Jaacks's racist comment, but he mentioned it to supervisors Greg Millen and John McDonald. Their response was that it was "messed up."

Aldridge testified about an incident when he asked Jaacks to be cabbed back from Tracy, Minnesota so he could get started with days off. Jaacks told him to call Shawn Engel to see if the Railroad would do that. Engel said that was fine, and Aldridge called Jaacks to tell her. Jaacks responded, "I guess you got what the fuck you wanted because if it was fucking me, I would tie your ass up in Tracy and leave you over there." (Doc. 24-1, Aldridge depo, pp. 88-89.) According to Aldridge, his co-worker Dave Van Asperen heard Jaacks's remark to Aldridge, and Van Asperen reported it to supervisor John McDonald. (Aldridge depo, p. 89.) According to Aldridge's depostion testimony, this spurred the managers to call Aldridge in to discuss what had happened with Jaacks. Aldridge said he told the managers that he did not want to report Jaacks because she had so much control over his life. (Adridge depo, p. 98.)

Aldridge also heard about a time when Jaacks told another Railroad employee, Chad French, "that fucking black Larry [Aldridge] didn't do a fucking thing last night." (Aldridge depo, p. 89.) Aldridge did not personally hear this comment.

Later, Jaacks told an employee named Rafael Clemente that he was not "the Canadian Pacific nigger slave." It is not clear when this comment was made. Rafael told Aldridge about this incident - - Aldridge did not hear it himself. According to Aldridge, following a report of this comment, the Railroad conducted an investigation and terminated Jaacks's employment. Jaacks's termination occurred after Aldridge had already been terminated.

On January 11, 2019, Aldridge filed a charge of discrimination with the South Dakota Department of Human Rights and U.S. Equal Employment Opportunity Commission ("EEOC"). In his charge, Aldridge indicated that he was discriminated against based on his race and color. On May 9, 2019, the EEOC issued a Dismissal and Notice of Rights indicating that its investigation was unable to conclude that the Railroad had violated any statutes. Aldridge commenced this lawsuit against the Railroad on or about July 1, 2019, alleging race discrimination, hostile work environment and retaliation in violation of Title VII. He has abandoned the retaliation claim.

**PRINCIPLES OF SUMMARY JUDGMENT**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273-74 (8th Cir. 1988).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**A. Title VII Race Discrimination**

### 1. The Law

Aldridge alleges that the Railroad discriminated against him based on his race in violation of Title VII.  Title VII of the Civil Rights Act of 1964 makes it unlawful for certain employers "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).

The Eighth Circuit has described what courts are to consider when ruling on a motion for summary judgment in an employment discrimination lawsuit:

> At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action. If so, the presence of additional legitimate motives will not entitle the defendant to summary judgment. Therefore, evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues.

*Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004).

To defeat summary judgment on his race discrimination claim, Aldridge must either show direct evidence of discriminatory motive or intent, or rely on the burden-shifting method in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to create an inference of discrimination. *Blake v. MJ Optical. Inc.*, 870 F.3d 820, 825–26 (8th Cir. 2017). Aldridge contends that he has direct evidence of discrimination and, alternatively, that he can satisfy the *McDonnell Douglas* test.

Direct evidence of discrimination "is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *EEOC v. Audrain Health Care, Inc.*, 756 F.3d 1083, 1086 (8th Cir. 2014) (internal quotation marks and citation omitted). "[S]tray remarks in the workplace, statements by nondecisionmakers, and statements by decisionmakers unrelated to the decisional process do not constitute direct evidence." *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009) (internal quotation marks and citation omitted). "Direct evidence, however, may include evidence of actions or remarks of the employer that reflect a discriminatory attitude, comments which demonstrate a discriminatory animus in the decisional process, or comments uttered by individuals closely involved in employment decisions." *Id.* at 1161 (internal quotation marks and citations omitted).

A plaintiff proceeding under the direct method of proof may rely on either direct evidence or circumstantial evidence to prove discrimination. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011). *See also Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) ("'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial.") Direct evidence is rare, and essentially "requires that the employer admit its discriminatory intent." *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir. 2013). It is far more common for an employee pursuing the direct method to rely on circumstantial evidence, "which allows the trier of fact to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted) (emphasis in original). "Circumstantial evidence typically includes '(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received

systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.'" *Id.* (quoting *Sun v. Bd. of Trus. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007)).

Even if a supervisor is not technically permitted to make final decisions, their comments can still be direct evidence of discrimination when they play a "pivotal role" in the employer's treatment of the plaintiff. *Mohr v. Dustrol, Inc.*, 306 F.3d 636, 641 (8th Cir. 2002) (holding that "the direct evidence inquiry is not limited to those formally entrusted with decisionmaking duties" if a reasonable factfinder could conclude that the supervisor making the remark was closely involved in the decision), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95 (2003). If Aldridge produces direct evidence of discrimination, including circumstantial evidence, he does not need to rely on the *McDonnell Douglas* framework to survive summary judgment. *Griffith*, 387 F.3d at 736.

## 2. Analysis

At the heart of Aldridge's direct case are statements made by Jaacks, one of the two full-time managers on duty for the extra board. In its brief, the Railroad argues that, even if a remark made by Jaacks showed discriminatory intent, it cannot be direct evidence of discrimination because Jaacks was not a "decisionmaker" for the Railroad, and she was not connected to the "decisional process" concerning Aldridge's discipline and/or termination. (Doc. 25, p. 19-20.)

First, there is evidence of Jaacks's discriminatory intent. Aldridge testified that Jaacks made racially discriminatory or derogatory comments "all the time." (Doc. 24-1, Aldridge depo, p. 88.) He described four specific instances that included Jaacks telling Aldridge that blacks are supposed to ride in the back of vehicles, and telling Aldridge that she would tie his "ass up in Tracy and leave him over there." Third, Jaacks allegedly referred to Aldridge as "black Larry" when speaking to another employee. The fourth incident was when Jaacks told another employee that he was not a "Canadian Pacific nigger slave." This fourth comment was not related to Aldridge. The first two comments were directed at Aldridge. He did not personally hear the third or fourth comments.

The Railroad argues that the Court must disregard on summary judgment any comments not personally heard by Aldridge because they are hearsay. But the standard at the summary judgment stage is whether the evidence "could be presented at trial in an admissible form." *Gannon Int' Ltd.*

*v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). Jaacks's alleged third and fourth comments could be admissible by having witnesses who were present testify directly about the statements at trial. However, Aldridge did not demonstrate that he will be able to produce that testimony at trial. *See Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) ("Smith has 'failed to obtain deposition testimony or affidavits from [those] who gave these unsworn accounts, and thus . . . has failed to provide any evidence from these sources that even potentially would be admissible at trial.'") (quoting *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001)).

Even if the Court considers only Jaacks's statement that blacks should sit in back, the Court concludes that it constitutes direct evidence of discrimination. *See, e.g., EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990) (holding that a manager's statement that "you people can't do a ------- thing right" constituted direct evidence of race discrimination). While the comment about tying Aldridge up and leaving him in Tracy might not, on its face and out of context, be overtly racial in nature, a reasonable juror could determine that its purpose was to express racial animus in line with Jaacks's statement that blacks should sit in the back. Both comments were directed specifically at Aldridge. The Eighth Circuit has recognized that "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII." *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999) (citations omitted). Sorting out the meaning of the "tie your ass up and leave you in Tracy" comment is a job for the jury and not for this Court on summary judgment.

In sum, the Court concludes that Jaacks's comments to Aldridge are direct evidence of discrimination.

The Court rejects the Railroad's argument that Jaacks was not connected to the Railroad's discipline of Aldridge. The Railroad's general manager, Blake Jones, testified that RCP&E does not have a formal disciplinary process. (Doc. 24-3, Jones depo, p. 29.) It is up to the supervisors or the managers on duty to report a missed call to the general manager. (Jones depo, pp. 30-32.) Similarly, if an employee laid off sick and did not have any sick time left, the manager on duty is to call or email the general manager. (Jones depo, pp. 39-40.) If the manager on duty, such as Jaacks, decided not to contact the general manager, the general manager would not know about the infraction unless it was reported by someone else. (*Id.*)

Aldridge describes the crux of his case as being disciplined more harshly than the white employees, with the disparate discipline leading to his termination. (Doc. 22, pp. 28-29.) Jaacks was

11

one of two full-time managers on duty the entire time Aldridge worked for the Railroad. (Jones depo, p. 88.) She could decide whether or not to report an employee's missed call or use of a sick day. Aldridge submitted a declaration stating that Jaacks was the manager on duty who sent him for discipline on multiple occasions, including on February 12, 2016 and July 16, 2017. (Doc. 24-6, ¶ 4.) He avers that Jaacks also "pushed for" his termination in 2018. (*Id.*) Although Jaacks may not have been in charge of issuing the formal reprimands or deciding the level of discipline to impose, Aldridge has presented evidence that Jaacks played a role in disciplinary actions against Aldridge, which moved him toward the final adverse employment action in the form of discharge.

The Court is also informed by Aldridge's circumstantial evidence of discrimination. Aldridge testified that Jaacks had control over scheduling him, including days off. There is a policy where extra board employees can ask for days off in that month or the following month if there is enough manpower and the management approves the days off. (Doc. 24-7, p. 3.) The extra board employees can receive up to four days off per month. *Id.* Aldridge testified that if Jaacks had something against you, you could get no days off, and Aldridge went months without getting days off. (Doc. 24-1, Aldridge depo, p. 98.) Aldridge provided a specific example of how Jaacks denied him time off in dispensing the extra board's days off. A friend of Aldridge's offered to transfer his days off to Aldridge. (Aldridge depo, p. 85.) When Aldridge called Jaacks to let her know, Jaacks told Aldridge, "those are not his fucking days to give you, so you are not getting them days off." (*Id.*) She awarded the days off to another employee. (*Id.*)

Furthermore, Aldridge presented evidence that two of his white co-workers were permitted to use sick days when they were not sick without being punished. Hine testified in his deposition that he used a sick day when he wasn't sick "maybe six times." (Doc. 24-8, Hine depo, p. 17.) Parker testified that he used sick days when he wasn't sick approximately twelve times. (Doc. 24-5, Parker depo, p. 18.) Both men said they were never disciplined for using sick days when they were not sick. But there is evidence that Aldridge was disciplined for using sick days when he was not sick. The Railroad argues that Hine and Parker's use of sick days when they were not sick cannot be considered because the men could not say exactly when these incidents occurred, and they could have occurred before the Railroad changed the policy from allowing sick days to be used by employees when they were not sick, to disallowing such use of sick days. But the Railroad has no evidence that Hine and Parker's use of sick days for personal days occurred after the alleged policy change. Questions of

material fact exists whether the Railroad allowed white employees to use sick days when they were not sick without discipline, and punished Aldridge for the same conduct.

The Court also considers the letter written by Hine in support of Aldridge during the investigation of Aldridge's final missed call in 2018. (Doc. 24-11 and Hine depo, pp. 13-16.) In the letter, Hine gave an example of when he missed a call and was not punished for it. He indicated that it is common practice not to be disciplined for missing a call, and stated that "to single out one employee is not professional and wrong."

Jaacks was in a position to substantially impact Aldridge's opportunities for days off work and his discipline for missing calls to work or taking sick leave. It is for the jury to make credibility findings and decide whether or not Aldridge's proffered direct evidence of discrimination is to be believed, and whether Aldridge's race played a motivating part in the adverse employment decisions at issue. Though the Railroad contends that the adverse conduct claimed by Aldridge was justified due to his missed calls and other infractions, this is only relevant to determining whether race was a motivating factor in the treatment of Aldridge. The Court concludes that Aldridge has presented sufficient direct evidence of race discrimination to avoid summary judgment.

Aldridge also argues that he has presented sufficient indirect evidence of race discrimination under the burden-shifting framework established in *McDonnell Douglas*. Because the Court finds that the record contains direct evidence of race-based discrimination, it need not address the *McDonnell Douglas* framework. *See*, *e.g.*, *Griffith*, 387 F.3d at 736 (holding that a plaintiff with direct evidence that illegal discrimination motived the employer's adverse action "does not need the three-part *McDonnell Douglas* analysis to get to the jury").

**B. Title VII Hostile Work Environment Based on Race**

### 1. The Law

Aldridge claims that he was subjected to a hostile work environment at the Railroad based on his race. To establish a claim for hostile work environment, a plaintiff must show: "(1) that they belong to a protected group; (2) that they were subject to unwelcome harassment; (3) a causal nexus between the harassment and their membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) (in cases where the harasser is not the plaintiffs' supervisor) that the defendant knew or should have known of the harassment and failed

to take proper remedial action." *Dowd v. United Steelworkers of Am., Local No. 286*, 253 F.3d 1093, 1101 (8th Cir. 2001) (citation omitted).

There is no dispute that Aldridge belongs to a protected group. In addition, there is evidence that Jaacks made comments that were unwelcome, and that some comments were connected to Aldridge's race. The Railroad denies that Aldridge reported Jaacks's behavior. Though Aldridge admits that he didn't file a formal complaint in writing, there is evidence in the record that Aldridge's supervisors and managers knew about Jaacks's statements to Aldridge and failed to take remedial action. In any event, the general rule is that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). The question, then, is whether Aldridge has presented enough evidence to overcome summary judgment on the issue whether the harassment affected a term, condition, or privilege of his employment.

The Eighth Circuit has explained that this element requires "a twofold inquiry." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005). "First, the harassment must be sufficiently severe or pervasive to create an 'objectively hostile' work environment . . . . Second, if the victim does not subjectively perceive the environment as abusive, then the conduct has not altered the conditions of employment." *Id.* (internal citations omitted). In other words, the conduct must be severe as viewed objectively by a reasonable person and subjectively by the alleged victim. *Singletary v. Missouri Dep't of Corrs.*, 423 F.3d 886, 892 (8th Cir. 2005) (citation omitted).

The Eighth Circuit has elaborated on the inquiry into whether or not the environment was "objectively hostile":

> [The environment] must be more than merely offensive, immature or unprofessional; it must be extreme. Conduct that does not exceed the threshold of severity is insufficient to create a prima facie case of sexual harassment. Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace.

*Kratzer*, 398 F.3d at 1047 (internal citations and quotations omitted). In other words,

> [H]arassment standards are demanding — to be actionable, conduct must be extreme and not merely rude or unpleasant. More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that

>it poisoned the work environment. [The plaintiff] must prove his workplace was permeated with discriminatory intimidation, ridicule, and insult.

*LeGrand v. Area Res. for Cmty. and Human Servs.*, 394 F.3d 1098, 1101–02 (8th Cir. 2005) (internal citations and quotations omitted). The determination of whether or not an environment was "objectively hostile" is "a fact-intensive inquiry." *Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 456 (8th Cir. 2001) (citing *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1109 (8th Cir. 1998)). To determine whether a work environment would be objectively offensive to a reasonable person, courts "examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Singletary*, 423 F.3d at 892. A single offensive utterance or exposure to distasteful conduct ordinarily does not rise to the level of a Title VII violation. *See Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997). However, courts have recognized that "'a supervisors use of [a racially derogatory term] impacts the work environment far more severely than use by co-equals.'" *See*, *e.g.*, *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (quoting *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)).

### 2. Analysis

The Railroad cites a number of Eighth Circuit cases in support of its argument that one race-based comment like Jaacks made to Aldridge is insufficient to show a hostile work environment. It is true that an isolated incident, without more, ordinarily would not be so severe as to alter the terms and conditions of Aldridge's employment. However, Jaacks's comments did not stop with telling Aldridge that blacks should sit in the back. She also told Aldridge that she would tie him up and leave him in Tracy, Minnesota. As stated earlier, sorting out the meaning of the "tie your ass up and leave you in Tracy" comment is a job for the jury and not for the court on summary judgment.

Aldridge testified that his co-worker, Dave Van Asperen, overheard Jaacks's statement that she would tie Aldridge's ass up in Tracy and leave him there. (Doc. 24-1, Aldridge depo, pp. 83, 88-89, 97-98.) Aldridge said Van Asperen reported it to a supervisor. (*Id.*, pp. 83, 89). The head

of HR, Cory Thompson, spoke to Aldridge about the incident after he learned about it. (*Id.*, pp. 83, 97-98.) Aldridge described breaking down and telling Thompson "a lot more," but Aldridge said he was afraid to complain to the general manager about Jaacks:

> And then I broke down and told him [Cory Thompson] a lot more stuff. And that's when he called Blake Jones. Blake Jones called Shawn Engel. And that's when they pulled me in the office and asked me what do you have against Terri, what's going on with you and Terri. And I told them specifically, I said you know what, if I even tell you something about Terri -- Terri was the board, so she controls my life. So if I want a day off, Terri can make me not have that day off. She can give it to somebody else.

(Doc. 24-1, Adridge depo, p. 98.) His testimony indicates that he was reluctant to report Jaacks's behavior because she had so much control over him and that, when he did turn to Railroad management, he did not receive any redress. The import of Jaacks's position as a manager and not just a co-worker cannot be overlooked in examining "all the circumstances" to determine whether harassment was objectively and subjectively severe.

Furthermore, when Aldridge told Jaacks that his friend and co-worker offered his days off to Aldridge, Jaacks told Aldridge, "those are not his fucking days to give you, so you are not getting them days off," and Jaacks awarded the days off to another employee. "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." *Carter v. Chrysler Corp.*, 173 F.3d at 701.

After careful consideration of the record, in particular Alrdridge's deposition testimony, the Court concludes that an objective person who was experiencing what Aldridge's testimony says he did could reasonably find that his work environment was offensive, or "hostile or abusive." In addition, the fact that Aldridge told his direct supervisors about the "blacks are supposed to be in back" comment demonstrates that he subjectively found that his work environment was offensive. He also testified in his deposition that discriminatory comments affected his ability to do his work. (Doc. 24-1, Aldridge depo, p. 140.)

For all of these reasons, Aldridge has sufficiently alleged a submissible hostile work environment claim, and the Railroad's motion for summary judgment is denied.

### C. Punitive Damages

#### 1. The Law

In a Title VII action, punitive damages are available if a plaintiff shows that his employer engaged in discrimination "with malice or with reckless indifference to the federally protected rights" of the victim of discrimination. 42 U.S.C. § 1981a(b)(l). The Supreme Court has explained that "'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999). For an employer to be liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 536. The employee need not show that the employer engaged "in conduct with some independent, 'egregious' quality." *Id.* at 538. If a plaintiff-employee shows that another employee of the company acted with the requisite malice or reckless indifference, the plaintiff must then show that this employee's mental state can be imputed to the employer. *Id.* at 539. The malice or reckless indifference of employees serving in a managerial capacity and acting within the scope of their employment may be imputed to the employer. *Id.* at 546, 549. An employer may avoid liability for punitive damages, however, if it shows that the employee's actions "are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* at 545; *EE0C v. Siouxland Oral Maxillofacial Surgery Associates, L.L.P.*, 578 F.3d 921, 925 (8th Cir. 2009). If an employer discriminates in contravention of its own policies, however, the existence of those policies does not allow the employer to escape punitive damages. *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 931 (8th Cir. 2004).

*Siouxland Oral* is instructive on this issue. There, the EEOC brought charges on behalf of two plaintiffs who were fired and not hired, respectively, allegedly because the two women were pregnant at the time. A jury found that Siouxland Oral had impermissibly discriminated against the women in violation of Title VII and the Pregnancy Discrimination Act. As a result, the plaintiffs were awarded back-pay and attorney fees. But the court had ruled as a matter of law that punitive damages were not warranted. The EEOC appealed to the Eighth Circuit, which reversed the ruling as to punitive damages. In so holding, the Eighth Circuit found that the evidence submitted "'was sufficient for a jury to find that Siouxland acted in the face of a perceived risk that it was violating [Plaintiffs'] Title VII rights. With respect to [Plaintiff-]Dooley, the EEOC presented evidence that

[the Defendant], who ordered Dooley's termination, knew that pregnancy discrimination was illegal." *Siouxland Oral*, 578 F.3d 925.

## 2. Analysis

The Railroad argues that it is entitled to summary judgment on the punitive damages claim because it did not act with malice or reckless disregard for Plaintiff's rights under Title VII and because it made a good-faith effort to prevent discrimination in the workplace. The Railroad refers to its written anti-discrimination policy which included directions for employees to report discrimination. (Doc. 21-2, Exhibit B, pp. 412, 416-417). The Railroad also relies on testimony that some managers received at least some training specific to racial discrimination. (Jones depo, p. 10); (Shafer depo, pp. 10–11).

Aldridge counters that having a policy for reporting discrimination and showing a video that contains a segment on discrimination are not enough to grant summary judgment on punitive damages when the Railroad's leadership did not abide by its own reporting policy.

Viewing the evidence in the light most favorable to Aldridge and drawing all reasonable inferences in his favor, the Court concludes that the record is sufficient to send Aldridge's punitive damages claim to a jury. Accordingly,

**IT IS ORDERED**:

> 1. That Defendant's motion for summary judgment, (Doc. 18), is denied.
>
> 2. That because Plaintiff has withdrawn his retaliation claim, that claim is dismissed.

Dated this 23rd day of February, 2021.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, Clerk

18